## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PETER STEIN, Individually and on Behalf of All Others Similarly Situated,

             Plaintiff,

    v.

ADESTO TECHNOLOGIES CORPORATION, NELSON CHAN, NARBEH DERHACOBIAN, HERVÉ FAGES, FRANCIS LEE, KEVIN PALATNIK, and SUSAN UTHAYAKUMAR,

             Defendants.

Case No.   1:20-cv-2900

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Peter Stein ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Adesto Technologies Corporation ("Adesto" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Adesto, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Adesto and Dialog Semiconductor plc ("Dialog").

2.    On February 20, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $12.55 in cash for each share of Adesto stock they own (the "Merger Consideration").

3.    On March 16, 2020, in order to convince Adesto shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Preliminary Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.    The materially incomplete and misleading preliminary proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act. On March 27, 2020, the Board authorized the filing of a Form DEFM14A Definitive Proxy (the "Proxy") that did not correct the materially misleading nature of the Preliminary Proxy. The Board has scheduled a special meeting of the Company's shareholders on May 5, 2020 to vote on the Proposed Transaction.

4.    While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.    In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Adesto shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Adesto's financial

advisor, Cowen and Company, LLC. ("Cowen") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.    It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Adesto shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took place in this District and the Company's common stock trades on the NASDAQ, which is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Adesto common stock.

12.     Defendant Adesto is incorporated in Delaware and maintains its principal executive offices at 3600 Peterson Way, Santa Clara, California 95054. The Company's common stock trades on the NASDAQ under the ticker symbol "IOTS."

13.     Individual Defendant Nelson Chan is Adesto's Chairman and has been a director of Adesto at all relevant times.

14.     Individual Defendant Narbeh Derhacobian is Adesto's co-founder, President and Chief Executive Officer and has been a director of Adesto at all relevant times.

15.     Individual Defendant Hervé Fages has been a director of Adesto since August 2019.

16.     Individual Defendant Francis Lee has been a director of Adesto since July 2015.

17.     Individual Defendant Kevin Palatnik has been a director of Adesto since September 2015.

18.     Individual Defendant Susan Uthayakumar has been a director of Adesto since August 2019.

19.     The Individual Defendants referred to in paragraphs 13-18 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Adesto (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of February 28, 2020, there were approximately 31,000,000 shares of Adesto common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Adesto will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.     The Proposed Transaction**

22.     Adesto provides application specific semiconductors and embedded systems that provide key building blocks of Internet of Things edge devices operating on networks worldwide. The Company's broad portfolio of semiconductor and embedded technologies are optimized for connected Internet of Things devices used in industrial, consumer, communications and medical applications.

23.     On February 20, 2020, Adesto and Dialog issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> LONDON, Feb. 20, 2020 (GLOBE NEWSWIRE) -- Dialog Semiconductor plc (XETRA:DLG), a leading provider of power management, charging, AC/DC power conversion, Wi-Fi and Bluetooth® low energy technology, and Adesto Technologies Corporation ("Adesto") (NASDAQ:IOTS), a leading provider of innovative custom integrated circuits (ICs) and embedded systems for the Industrial Internet of Things (IIoT) market, today announced they have signed a definitive agreement for Dialog to acquire all outstanding shares of Adesto.
>
> Adesto accelerates Dialog's expansion into the growing IIoT market that enables smart buildings and industrial automation (Industry 4.0), seamlessly driving cloud connectivity. Headquartered in Santa Clara, California, Adesto has approximately 270 employees and an established portfolio of industrial solutions for smart building automation that fully complements Dialog's manufacturing automation products. Adesto's solutions are sold across the industrial, consumer, medical, and communications markets.
>
> "This acquisition substantially enhances our position in the Industrial IoT market," said Jalal Bagherli, CEO of Dialog. "Adesto's established strength in connectivity solutions and highly optimized products for building and industrial automation perfectly complements and adds scale to our Industrial IoT portfolio from the recently acquired Creative Chips. Adesto's deep customer relationships, comprehensive system expertise, and proprietary technology will deliver enhanced value for Dialog customers."
>
> "Together with Dialog, we are positioned to create unique Industrial IoT solutions through the integration of our best-in-class technologies for today's increasingly connected world," added Adesto's CEO, Narbeh Derhacobian. "We are extremely pleased to join Dialog to bring more value to our combined customer base."

<u>Benefits of Transaction</u>

Bringing Dialog and Adesto together creates a complementary product portfolio for servicing a broad customer base in growth segments of the industrial market and enables cross-selling.

The combination:

- Scales Dialog's IIoT sector capabilities by combining industrial connectivity, smart metering and building automation solutions, and access to more than 5,000 customers, the majority of which are new for Dialog

- Complements Adesto's industrial wired connectivity portfolio with Dialog's wireless portfolio (BLE, Wi-Fi) for smart building and industrial applications. Cloud-connectivity adds further differentiation to Dialog's existing Industrial solutions

- Enables full system solutions for wearables, hearables, and other IoT applications by combining Adesto's low-power specialty memory products with Dialog's BLE & Wi-Fi connectivity and True Wireless Stereo (TWS) Audio ICs

- Unlocks future growth in the Automotive market by qualifying Adesto's specialty memory products by leveraging Dialog's established Automotive production and test flow. Additionally, these products address the emerging, fast-growing Artificial Intelligence (AI) segment

- Adds engineering and design scale to expand Dialog's existing custom IC business making Dialog one of the largest custom analog mixed-signal semiconductor providers

<u>Transaction Structure and Terms</u>

Dialog will acquire Adesto for $12.55 per share in cash, or for approximately $500 million enterprise value. The deal will be funded from Dialog's balance sheet.

The transaction is expected to be EPS accretive1 for Dialog within the first calendar year following close. Dialog expects annual cost synergies of approximately $20 million within the first calendar year of close across the combined company. Dialog also anticipates considerable additional revenue synergies given the complementary nature of the product portfolios and technology. Adesto expects to report FY 2019 revenue of approximately $118 million and continued revenue growth is anticipated over the next few years.

The transaction is subject to certain regulatory approvals and customary closing

conditions and is expected to close in the third quarter of 2020.

The Board of Directors of Adesto has unanimously approved the transaction and recommends that Adesto stockholders vote in favor of the transaction, and directors and executive officers of Adesto have agreed to vote their shares in favor of the transaction.

Hogan Lovells is serving as Dialog's legal counsel, while BMO Capital Markets is serving as financial advisor. Fenwick & West LLP is serving as legal counsel for Adesto, with Cowen & Company, LLC serving as financial advisor.

**Conference Call Information:**

Dialog will host a conference call on Thursday, February 20 at 10:00 a.m. CET / 9:00 a.m. UK. A link to the webcast is available at https://webcast.openbriefing.com/dialog-feb2020/.

Participants can pre-register at www.incommuk.com/customers/dialogsemiconductorcall to receive access details via email. Additionally, conference call information is below.

Germany (Local): 0322 2109 8334
United Kingdom: 0800 640 6441
United Kingdom (Local): 020 3936 2999
United States: 1 855 979 6654
United States (Local): 1 646 664 1960
All other locations: +44 20 3936 2999
**Access code: 863503** (Participants will be greeted by an operator who will register their details.)

**NOTES**

For further information, please contact the following representatives.

**Dialog Investor Relations Contacts:**        **Dialog Media Contact:**


Jose Cano
Head of Investor Relations
Dialog Semiconductor
Phone: +44 (0)1793 756 961
jose.cano@diasemi.com

UK – Matt Dixon
FTI Consulting London
Phone: +44 (0)2037 271 137
matt.dixon@fticonsulting.com


Germany – Anja Meusel
FTI Consulting Frankfurt
Phone: +49 (0)69 9203 7120
anja.meusel@fticonsulting.com


US – Antonia Gray
FTI Consulting New York
Phone: +1 (212) 850-5663
antonia.gray@fticonsulting.com

Mark Tyndall
SVP Corporate Development & Strategy
Dialog Semiconductor
Phone: +1 (408) 845-8520
mark.tyndall@diasemi.com


Web: www.dialog-semiconductor.com
Twitter: @DialogSemi


**Adesto Investor Relations Contact:**


Joel W. Achramowicz
Managing Director
Shelton Group
Phone: +1 (415) 845-9964
sheltonir@sheltongroup.com


**Adesto Media Contact:**

Jen Bernier-Santarini

VP, Corporate Communications
Adesto Technologies
Phone: +1 (650) 336-4222
jen.bernier@adestotech.com

**About Dialog Semiconductor**
Dialog Semiconductor is a leading provider of integrated circuits (ICs) that powers
the Internet of Things and Industry 4.0 applications. Dialog solutions are integral
to some of today's leading smartphones and the enabling element for increasing
performance and productivity on the go. From making smartphones more power
efficient and shortening charging times, enabling home appliances to be controlled
from anywhere, to connecting the next generation of wearable devices, Dialog's
decades of experience and world-class innovation help manufacturers get to what's
next.

Dialog operates a fabless business model and is a socially responsible employer
pursuing many programs to benefit the employees, community, other stakeholders
and the environment it operates in. Dialog is headquartered near London with a
global sales, R&D and marketing organization. In 2019, it had approximately $1.4
billion in revenue and is consistently one of the fastest growing European public
semiconductor companies. It currently has approximately 2,000 employees
worldwide. The company is listed on the Frankfurt (FWB: DLG) stock exchange
(Regulated Market, Prime Standard, ISIN GB0059822006) and is a member of the
German MDAX and TecDax indices.

For more information, visit www.dialog-semiconductor.com.

**About Adesto Technologies Corporation**
Adesto Technologies Corporation (NASDAQ:IOTS) is a leading provider of
innovative application-specific semiconductors and embedded systems for the
Industrial IoT. The company's technology is used by a broad industrial customer
base worldwide. With its growing portfolio of high-value technologies, Adesto is
helping its customers usher in the era of the Internet of Things.

For more information, visit www.adestotech.com or follow Adesto on Twitter.

24.    Adesto is well-positioned for financial growth and the Merger Consideration fails

to adequately compensate the Company's shareholders. It is imperative that Defendants disclose

the material information they have omitted from the Proxy, discussed in detail below, so that the

Company's shareholders can properly assess the fairness of the Merger Consideration for

themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

25.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading Proxy

26.     On March 16, 2020, Defendants caused the Preliminary Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Preliminary Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Preliminary Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Preliminary Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act. On March 27, 2020, the Board authorized the filing of the Proxy, which did not correct the materially misleading nature of the Preliminary Proxy.

### *The Materiality of Financial Projections*

27.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses that "in connection with its evaluation of the Merger, Adesto's management prepared projections through the year ending December 31, 2025." Proxy 54-55. These projections were provided to the Board, Dialog and Cowen. *Id.*

28. When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101). Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions. In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

29. Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

30. In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual

results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

31.     Here, Adesto shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it and determine that the Proposed Transaction is fair to, and in the best interests of, the Company and its shareholders. Proxy 41-42.

32.     As discussed further below, the non-GAAP financial projections used do not provide Adesto's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

33.     The Proxy discloses that "in connection with its evaluation of the Merger, Adesto's management prepared projections through the year ending December 31, 2025." *Id.* at 54-55. These projections were provided to the Board, Dialog and Cowen. *Id.* at 55.

34.     The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2020 through 2025 for: (1) Non-GAAP Gross Profit, (2) Non-GAAP Operating Income, (3) Non-GAAP Net Income, (4) Adjusted EBITDA and (5) Unlevered Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 56.

35.     The Proxy defines each of Non-GAAP Gross Profit, Non-GAAP Operating Income and Non-GAAP Net Income as a "[n]on-GAAP financial measure which excludes the effect of

stock-based compensation expense and non-recurring items." *Id.* at 56 n.1. Nevertheless, the Proxy fails to reconcile Non-GAAP Gross Profit, Non-GAAP Operating Income or Non-GAAP Net Income to their most comparable GAAP measures or disclose all of the line items used in their calculations, rendering the Proxy materially false and/or misleading. *Id.*

36.     The Proxy defines Adjusted EBITDA as "a non-GAAP financial measure calculated by adjusting non-GAAP net income (loss) to add back interest expense, levered income tax expense, and depreciation and amortization." *Id.* at 56 n.2. Nevertheless, the Proxy fails to reconcile Adjusted EBITDA to its most comparable GAAP measure or disclose all of the line items used to calculate Adjusted EBITDA, rendering the Proxy materially false and/or misleading. *Id.*

37.     The Proxy defines Unlevered Free Cash Flow ("UFCF") as "a non-GAAP financial measure calculated by subtracting stock-based compensation expense, capital expenditures, increase in net working capital and unlevered income tax expense from Adjusted EBITDA." *Id.* at 56 n.5. Nevertheless, the Proxy fails to reconcile UFCF to its most comparable GAAP measure or disclose all of the line items used to calculate UFCF, rendering the Proxy materially false and/or misleading. *Id.*

38.     Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon. It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

39.    The non-GAAP financial projections disclosed on page 56 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

40.    As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisor.

### The Financial Projections Violate Regulation G

41.    The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

42.    Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

43.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Adesto included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that

---

[4]     SEC, *Final Rule.*
[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

44.    The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

---

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm. *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures. Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf. *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.    The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflects the SEC's official position. Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G. The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

45.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

46.    In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

47.    Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "non-GAAP financial measures should not be viewed as a substitute for GAAP financial measures, and may be different from non-GAAP financial measures used by other companies. Furthermore, there are limitations inherent in non-GAAP financial measures, because they exclude charges and credits that are required to be included in a GAAP presentation. Accordingly, these non-GAAP financial measures should be considered together with, and not as an alternative to, financial measures prepared in accordance with GAAP."  Proxy 55.

48.    As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

49.    In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 56, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### The Materially Misleading Financial Analyses

50.    The summary of the valuation methodologies utilized by Cowen, including the utilization of certain of the non-GAAP financial projections described above by Cowen, in connection with its valuation analyses (*id.* at 46) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a Proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

51.    With respect to Cowen's *Discounted Cash Flow Analysis*, the Proxy states that Cowen performed a discounted cash flow analysis on Adesto's forecasted unlevered free cash flow for the nine-month period ending December 31, 2020 and for the calendar years ending December 31, 2021 through December 31, 2024, as provided by Adesto management. *Id.* at 52. Cowen calculated a terminal value based on Adesto's forecasted Adjusted EBITDA for the calendar year ending December 31, 2025, as provided by the Company's management. *Id.* Cowen utilized a discount rate range of 13.5% o 15.5% based on the Company's weighted average cost of capital, and a terminal multiple range for Adesto's forecasted Adjusted EBITDA of 10.0x to 12.0x. *Id.* Cowen also calculated the present value of Adesto's estimated federal and state net operating loss carryforwards, as provided by Adesto management, utilizing a discount rate of 15.3%, based on Adesto's cost of equity. *Id.*

52.    The Proxy fails to disclose the calculated terminal values, the inputs to the Company's weighted average cost of capital and cost of equity, the value of the federal and state

net operating loss carryforwards, whether any enterprise adjustments were made or the number of fully diluted shares outstanding.

53.    Since information was omitted, shareholders are unable to discern the veracity of Cowen's discounted cash flow analysis. Without further disclosure, shareholders are unable to compare Cowen's calculations with the Company's financial projections.  The absence of any single piece of the above information renders Cowen's discounted cash flow analysis incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

54.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id.* (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

55.    Therefore, in order for Adesto shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

56.    In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP

equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Adesto shareholders.

57.    Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

58.    Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## **COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and
17 C.F.R. § 244.100 Promulgated Thereunder)**

59.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

61.    As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

62.    The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

63.    As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

64.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy statements that contain "any statement which, at the time and in the light of the circumstances under which it

is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]"  17 C.F.R. § 240.14a-9(a).

66.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*."  17 C.F.R. § 244.100(b) (emphasis added).

67.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

68.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

69.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information

identified above in connection with their decision to approve and recommend the Proposed Transaction.

70.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

71.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

72.     Adesto is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

73.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

74.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief

as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act)

75.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

76.    The Individual Defendants acted as controlling persons of Adesto within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Adesto, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

77.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

79.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

80.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

81.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 8, 2020

Respectfully submitted,

**FARUQI & FARUQI, LLP**

**By:**  _/s/ James M. Wilson, Jr._

Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
          jwilson@faruqilaw.com

_Counsel for Plaintiff_

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Peter Stein ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Adesto Technologies Corporation ("Adesto") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Adesto securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 5th day of April, 2020.

Peter Stein

| Transaction<br>(Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 05/09/19 | 500 |
|  |  |  |
|  |  |  |